AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court

### for the
### Western District of New York

**United States of America**

v.

**ANGEL ELLIOT DALFIN**
**and**
**PAUL RICHARD HEIL**

*Defendants*

FILED

MAY 2 8 2021

MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

Case No. 21-mj- 5130

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about December 2019, to on or about October 30, 2020, in the Western District of New York, the defendants, ANGEL ELLIOT DALFIN and PAUL RICHARD HEIL did knowingly and willfully conspire and agree to commit offenses against the United States, that is,

(1) having devised and intended to devise a scheme to defraud and to obtain money by means of false and fraudulent pretenses and representations, did cause to be transmitted by means of wire communications in interstate commerce, writings, signs, and signals, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

(2) making and using false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in violation of Title 18, United States Code, Section 1001(a)(3);

all in violation of Title 18, United States Code, Sections 371.

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_K. Angela Rivera_
*Complainant's signature*

K. Angela Rivera, Special Agent, EPA
*Printed name and title*

Sworn to before me and signed telephonically.

Date: May 28, 2021

City and State: Buffalo, New York

_Michael J Roemer_
*Judge's signature*

HON. MICHAEL J. ROEMER, USMJ
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**</u>

I, K. Angela Rivera, being duly sworn, depose and state:

## I.   <u>INTRODUCTION</u>

1.      I am a Special Agent with the Criminal Investigation Division (CID) of the United States Environmental Protection Agency (EPA), and have been so since August 2010. I am presently the Resident Agent in Charge of the Buffalo Resident Office, which is responsible for the Western District of New York.   In addition, I previously worked as a Special Agent with the Internal Revenue Service, Criminal Investigation Division for approximately six years.   I have personally investigated and participated in the successful prosecutions of individuals who have violated the criminal laws of the United States, including violations of the Toxic Substances Control Act (TSCA), the Clean Air Act (CAA), the Clean Water Act (CWA), and the Resource Conservation and Recovery Act (RCRA). My responsibilities include investigating criminal violations of these, and other environmental statutes, as well as other violations under Title 18 of the United States Code.

2.      I   make this affidavit in support of a criminal complaint charging **ANGEL ELLIOT DALFIN** ("DALFIN") and **PAUL RICHARD HEIL** ("HEIL") with conspiracy to commit offenses against the United States, that is, (1) wire fraud in violation of Title 18, United States Code, Sections 1343, and (2) making and using a materially false document in violation of Title 18, United States Code, Section 1001(a)(3), all in violation of Title 18, United States Code, Section 371.

3.      The statements contained in this affidavit are based on my involvement in this investigation, as well as information provided to me by other law enforcement officers involved in this investigation, and upon my training and experience.  Because this affidavit is being submitted for the limited purpose of seeking a criminal complaint, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that DALFIN and HEIL did knowingly conspire to commit offenses against the United States in violation of Title 18, United States Code, Section 371.

## II.      **STATUTORY BACKGROUND**

4.      In the Residential Lead-Based Paint Hazard Reduction Act of 1992 (Lead Hazard Reduction Act), Congress found that "the health and development of children living in as many as 3,800,000 American homes is endangered by chipping or peeling lead paint, or excessive amounts of lead-contaminated dust in their homes" and that "at low levels, lead poisoning in children causes intelligence quotient deficiencies, reading and learning disabilities, impaired hearing, reduced attention span, hyperactivity, and behavior problems." 42 U.S.C. § 4851(2) and (5).

5.      The Lead Hazard Reduction Act, among other requirements, charged sellers and lessors of certain housing with a duty to disclose to buyers the presence of known lead-based paint and any known lead-based paint hazards.

6.     The Lead Hazard Reduction Act required the Department of Housing and Urban Development (HUD) and the EPA to promulgate regulations specifying the duties of sellers and lessors.  The EPA and HUD jointly published these regulations at 40 C.F.R. § 745.100 (Subpart F) and 24 C.F.R § 35 (Subpart H), and these regulations are referred to as the "Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazards Upon Sale or Lease of Residential Property" (the "Lead Disclosure Rule").


7.     The Lead Hazard Reduction Act and the Lead Disclosure Rule generally require sellers of pre-1978 dwellings to disclose known lead-based paint hazards, or, in the alternative, to certify that they have no knowledge of such hazards.  *See* 40 C.F.R. § 745.107(a)(2).  This disclosure is to be made in an attachment to the contract for the sale of the home.  *See* 40 C.F.R. § 745.113(a).  This attachment is often referred to as a "Lead Disclosure Form."


8.     Specifically, the Lead Disclosure Rule requires, among other things, that a seller of a residence built prior to 1978 disclose the presence of known lead-based paint and/or lead-based paint hazards to prospective purchasers, to include information regarding the basis for the determination that lead-based paint/hazards exist, the location of the lead-based paint/hazard, and the condition of the painted surfaces.  In addition, the seller of the residence must provide the purchaser with any records or reports available to the seller pertaining to lead-based paint and/or lead-based paint hazards in the residence being sold.

4

### III.    THE INVESTIGATION AND FACTUAL BASIS

### A.    Background

9.      In February of 2018, EPA received a referral from HUD, Lead Programs Enforcement Division, Office of Lead Hazard Control and Healthy Homes.  The referral involved multiple entities that owned and/or managed rental properties in Buffalo, NY: Williamsville Properties Holdings, LLC (Williamsville Properties), Purityson, LLC (Purityson), Gloucester Land Holdings, LLC (Gloucester Land Holdings), and Peck Properties, Inc. (Peck Properties).  These rental property entities, along with Homestead Land Holdings, LLC (Homestead), appeared to be owned and operated by the same individuals. The investigation revealed those individuals to be Angel Elliot Dalfin (DALFIN) and Paul Richard Heil (HEIL).  These entities had been cited with numerous notices of violation for lead paint hazards by the Erie County Department of Health (ECDOH).

10.     ECDOH had also received several reports of children with elevated blood lead levels (EBLLs) residing in these properties.  As part of its responsibilities, ECDOH routinely inspects houses for the presence of lead hazards and conditions conducive to lead poisoning. The ECDOH Childhood Lead Poisoning Prevention Program inspection process for lead paint hazards is initiated when a BLL result is submitted from the New York State daily laboratory results download, indicating that a child has been tested for lead exposure and has an EBLL.  The current BLL that triggers case management for children in New York State by programs is 5 µg/dL.  Before 2019, the blood lead level that triggered action was 10 µg/dL.

11.     In 2017, this same information regarding the entities mentioned above was also referred by HUD to the New York State Attorney General's Office in Buffalo, NY (NYSAG).

In September of 2020, the NYSAG filed a Complaint in the State Supreme Court, Erie County (Index No. 810362/2020). The Complaint named the defendants as DALFIN, various LLCs and companies that he owned and/or controlled and other individuals involved with those entities, including HEIL. The investigation revealed that DALFIN controlled the rental housing operation with HEIL as his agent and close associate. HEIL was acting as the local property manager in Buffalo, New York.

12.     The rental properties owned by the various LLCs and companies related to DALFIN and HEIL will hereinafter be referred to as the "Dalfin Properties."

**B.     Tenants Did Not Receive Lead Disclosure Notices Required by Federal Law**

13.     The investigation to date has revealed that from 2010 to present, approximately 40 to 50% of the units among the Dalfin Properties have been occupied by tenants receiving funding through Section 8, which provides financial assistance in the form of vouchers or certificates to very low-income families so that they can live in privately-owned housing. The other 50 to 60% of units were occupied by tenants not receiving Section 8 funding.

14.     From 2010 until 2018 or later, the only tenants in Dalfin Properties who received lead disclosures were the 40 to 50% of tenants with Section 8 funding, who received such disclosures under the direction of the public housing agencies (PHAs) that work directly with low-income tenants and their landlords to administer the Section 8 program.

15.     The 50 to 60% of tenants who were not part of the Section 8 program did not receive any lead disclosures until 2018 or later, if at all.

16.     In addition, even when tenants were provided the lead disclosure forms mandated by federal law, those disclosures repeatedly contained false statements to the tenants or prospective tenants, concealing hazardous conditions and the existence of reports pertaining to lead paint hazards in the premises.  For example, in April 2018, HEIL, acting as agent for DALFIN, and on behalf of Williamsville Properties and Peck Properties, provided a lead disclosure statement to the tenant, which falsely stated that the "Lessor (Landlord) has no knowledge of lead-based paint and/or lead-based paint hazards in the housing" and that "Lessor (Landlord) has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing."  In fact, the property in question (96 Wick) had been cited multiple times for lead paint hazards dating back to 2015, when a child residing at the property had an EBLL.  In fact, this child had multiple EBLLs while residing at the property.  The ECDOH had specifically instructed Williamsville Properties, in notices sent to Peck Properties and HEIL, that records of those violations must be disclosed to tenants.

**C.      False Lead Disclosures to Buyers in Violation of Federal Law through VIN7, LCC**

17.     In addition to providing false lead disclosures to renters, DALFIN has provided false lead disclosure statements to buyers of Dalfin Properties through VIN7, LLC.

18.     VIN7 LLC (VIN7) is a limited liability company organized under the laws of Maryland.  DALFIN is the sole member of VIN7.  According to paperwork filed with the New York State  Division of Corporations, State Records, and Uniform Commercial Code, the address for the entity operating in Erie County, New York, is 3842 Harlem Road, #291,

Buffalo, New York 14215, which is the same address used by Williamsville Properties, Homestead, and Peck Properties, and is a plaza that contains several businesses, one of which is a UPS Store.

19.     Beginning in 2019 and into 2020, DALFIN transferred ownership of the Dalfin Properties in Buffalo, New York, from various LLCs to VIN7; VIN7 then proceeded to sell these properties.  In total, VIN7 took title to at least 117 properties in Buffalo from affiliates, including: 70 from Williamsville Properties and 29 from Homestead.  The transfers to VIN7 are not arms' length transactions as DALFIN appears on both sides of the transaction.  For example, DALFIN signed on behalf of the seller, as "Manager" of Williamsville Properties when the buyer was VIN7 whose sole member was DALFIN.

20.     DALFIN, through VIN7, provided false lead disclosures to the buyers of numerous properties, many of which have an extensive history of lead paint violations documented by the ECDOH.  DALFIN provided false lead disclosures to the buyers of 94 Warren Avenue (94 Warren), 145 Ashley Street (145 Ashley), and 53 Shepard Street (53 Shepard) (other properties were sold as well, but these three properties will be explained in detail below).  These three properties have an extensive history of lead paint violations documented by the ECDOH.

21.     On June 26, 2020, VIN7 (as Seller) entered into a contract to sell 94 Warren to Liton A. Chowdhury.  By a deed dated July 27, 2020, VIN7 transferred to Liton A. Chowdhury title to 94 Warren.

22.     On June 29, 2020, VIN7 (as Seller) entered into a contract to sell 53 Shepard to Shaan Mgmt, Inc.  On June 30, 2020, VIN7 (as Seller) entered into a contract to also sell 145 Ashley to Shaan Mgmt.  By a deed dated August 15, 2020, VIN7 transferred to Shaan Mgmt, Inc., title to 145 Ashley, 53 Shepard and a third property.

23.     The contracts for sale of 94 Warren, 145 Ashley, and 53 Shepard each included a "Lead-Based Paint Rider and Disclosure" form (hereinafter "Lead Rider"), which was initialed and dated in June 2020 by the Seller.  The Lead Rider form contains, in part, the following language:

**Lead Warning Statement**

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure**

**(A)     Presence of Lead-Based Paint and/or Lead-Based Paint hazards. (check either (1) or (2) below.)**

**(1) Hazards Known.**  Attached hereto is a statement signed by Seller disclosing the presence of known lead-based paint and/or lead-based paint hazards at the Property, including but not limited to the basis for the determination that lead-based paint and/or lead based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards and the condition of the painted surfaces.

**(2) Hazards Unknown.** Seller has no actual knowledge of the presence of lead-based paint and/or lead-based paint hazards at this property.

(B)   **Records and Reports Available to Seller (check either (1) or (2) below.)**

**(1) Record Provided.** The following is a list of all records and/or reports available to Seller pertaining to lead-based paint and/or lead-based paint hazards at the Property.

_____

_____

**(2) No Records.** Seller has no records or reports pertaining to lead-based paint and/or lead-based paint hazards at the Property.

24.     The seller's disclosures on each of the Lead Riders for 94 Warren, 145 Ashley, and 53 Shepard stated for part (A) "Seller has no knowledge of the presence of lead-based paint and/or lead-based paint hazards at the Property" and for part (B) "Seller has no records or reports pertaining to lead-based paint and/or lead-based paint hazards at the Property."

25.     The disclosures made by DALFIN and VIN7 in the Lead Riders accompanying the sales of 53 Shepard, 145 Ashley, and 94 Warren are demonstrably false and in violation of federal law.

**D.     Extensive History of Lead-Based Paint Violations for Properties Sold by VIN7**

26.     The properties discussed above, 94 Warren, 145 Ashley, and 53 Shepard, are just an example of Dalfin Properties that have a long-documented history of lead-based paint violations and reports of children with EBLLs.  Collectively, between 2013 and 2020, at least

10

54 of the properties identified as being owned or managed by the defendants have been cited for lead hazards or conditions conducive to lead poisoning by ECDOH.

27.     The EPA investigation to date has shown that between 2013 and 2019 at least 23 children had an EBLL while residing at Dalfin Properties, and seven of those properties had multiple child EBLL referrals.

28.     When lead-based paint hazards were identified, it was standard operating procedure for ECDOH to send out notices of violation, or notice and demand letters, to the property owner/manager.  If applicable, ECDOH also included a LeadSAFE Erie County EBLL Investigation Report.  The notice and demand letter included statements reminding the property owner/manager of the obligation under federal law to *"disclose all available records and reports concerning lead-based paint and/or lead-based paint hazards, including the test results contained in this notice, to purchasers and tenants at the time of sale or lease or upon lease renewal"*.  It further explained that *"[t]his disclosure must occur even if hazard reduction or abatement has been completed."*

29.     HEIL received these notices in the mail and corresponded with ECDOH inspectors regarding lead-based paint violation inspections via email.[1]   On occasion, DALFIN was included on these emails with ECDOH inspectors or regarding inspections. Evidence to date shows that HEIL and DALFIN both had knowledge of the lead-based paint violations at the Dalfin Properties.

---

[1] The email HEIL used was heilproperties@gmail.com, which is a Google email address.  Google maintains its servers in the State of California.  Any other emails referenced herein by HEIL were sent using this email address.

30.     On December 16, 2019, DALFIN emailed one of his investors the following:[2]

> *"There is also 35 county of Erie health dept violations that was sent in all at once 10 days ago for outside painting and other issues so I am dealing with that now, I did 5 of them already last week."*

### i.     94 Warren Avenue

31.     According to ECDOH records, 94 Warren is a two-family house that was built in or about 1910 and was owned by Homestead beginning in 2012 through sometime in 2020.

32.     Between February 2015 and June 2019, ECDOH found numerous lead paint hazard violations at the property, including interior and exterior violations.   Notices of violation were issued on at least seven separate occasions: February 4, 2015, October 22, 2015, October 24, 2016, December 16, 2016, December 29, 2017, June 15, 2018, and June 4, 2019.

33.     On or about January 20, 2015, ECDOH received a report of a three-year-old child who occupied the house with her mother who had an EBLL of 15 µg/dL. Also living in the house were four other young siblings – two five-year-old twins, a six-year-old, and a seven-year-old.

---

[2] The email DALFIN used was dalfinny@gmail.com, which is a Google email address.  Google maintains its servers in the State of California.  Any other emails referenced herein by DALFIN were sent using this email address.

34.     ECDOH inspected the house on February 3, 2015, tested for and confirmed the presence of lead on surfaces in multiple locations, and created a LeadSAFE Erie County EBLL Investigation Report (the "February 2015 Report").

35.     On February 4, 2015, ECDOH sent a notice and demand letter to Homestead noting conditions conducive to lead poisoning and identifying 50 lead paint hazard violations at the property. ECDOH enclosed with that letter the February 2015 Report.  The notice and demand letter reminded Homestead of its obligation under federal law to "disclose all available records and reports concerning lead-based paint and/or lead-based paint hazards, *including the test results contained in this notice*, to purchasers and tenants at the time of sale or lease or upon lease renewal".  It further explained that "[t]his disclosure must occur even if hazard reduction or abatement has been completed."

36.     On April 8, 2015, HEIL submitted a Lead Remediation Work Plan to ECDOH.

37.     In May of 2015, HEIL, acting as agent for DALFIN, and on behalf of Homestead and Peck Properties, provided a lead disclosure statement to a new tenant, through Belmont Housing, which falsely stated that the "Lessor (Landlord) has no knowledge of lead-based paint and/or lead-based paint hazards in the housing" and that "Lessor (Landlord) has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing."

13

38.     On June 18, 2015, after interim controls purportedly were implemented, ECDOH inspected the property and observed that the violations had been "temporarily controlled, by the use of Interim Controls." By letter of June 22, 2015, ECDOH reminded Homestead of its "responsibility as owner of the property to regularly inspect the painted surfaces of the property for deterioration/damage, and to maintain these surfaces in good repair."

39.     In July of 2015, the new tenant moved into 94 Warren. On or about October 8, 2015, ECDOH received a report of a one-month-old child residing at 94 Warren with an EBLL of 25 µg/dL. Also living in the house were three other children ages two, five, and seven.

40.     ECDOH inspected the house on October 20, 2015, tested for and confirmed the presence of lead on surfaces in multiple locations, and created a LeadSAFE Erie County EBLL Investigation Report (the "October 2015 Report").

41.     On October 22, 2015, ECDOH sent a notice and demand letter to Homestead noting conditions conducive to lead poisoning and identifying 22 lead paint hazard violations at the property. ECDOH enclosed with that letter the October 2015 Report.

42.     On January 21, 2016, Peck Properties submitted a Lead Remediation Work Plan to ECDOH.

43.    On July 27, 2016, after interim controls purportedly were implemented, ECDOH inspected the property and observed that the violations had been "temporarily controlled, by the use of Interim Controls."  By letter of July 27, 2016, ECDOH reminded Homestead of its "responsibility as owner of the property to regularly inspect the painted surfaces of the property for deterioration/damage, and to maintain these surfaces in good repair."

44.    ECDOH reinspected the property on or about October 20, 2016.   The inspection report indicates "[c]hildren under six years old present or evidence thereof." ECDOH sent Homestead a letter dated October 24, 2016, stating that the ECDOH inspector "determined that conditions conducive to lead poisoning are present on your property." ECDOH included with that letter a notice of violation.  The notice of violation identified 19 specific violations, which consisted of areas of deteriorated paint that qualified as conditions conducive to lead poisoning.

45.    ECDOH sent Homestead a letter dated November 22, 2016, advising that its reinspection of the property showed that areas of deteriorated paint on the property had not been corrected.

46.    ECDOH sent Homestead another letter on December 16, 2016, stating that the inspector "determined that conditions conducive to lead poisoning are present on your property." ECDOH included with that letter a notice of violation, which showed that seven violations from the previous inspection that had not been properly remediated.

47.     On February 9, 2017, HEIL submitted a Lead Remediation Work Plan to ECDOH.

48.     ECDOH reinspected the property in December 2017 and found that lead paint violations remained. ECDOH sent Homestead a letter dated December 29, 2017, stating that "[s]ubsequent re-inspection of your property have showed that the areas of deteriorated paint on your property have NOT been satisfactorily corrected." ECDOH issued a notice of violation to Homestead dated December 21, 2017, for conditions conducive to lead poisoning.

49.     On February 14, 2018, HEIL submitted a Lead Remediation Work Plan to ECDOH.

50.     In June 2018, ECDOH reinspected the premises, found that lead paint violations remained, and issued a notice of violation dated June 15, 2018, which identified 17 violations for conditions conducive to lead poisoning.

51.     In June 2019, ECDOH reinspected the premises, found that lead paint violations remained, and issued a notice of violation dated June 4, 2019, for conditions conducive to lead poisoning. The violations had still not been remediated when ECDOH sent Homestead another letter on June 25, 2019, stating that "[s]ubsequent re-inspection(s) of your property have showed that the areas of deteriorated paint on your property have NOT been satisfactorily corrected."

16

### ii.    *145 Ashley Street*

52.    According to ECDOH records, 145 Ashley is a two-family house that was built in or about 1890 and was owned by Williamsville Properties beginning in 2013 through sometime in 2020.

53.    On or about August 2, 2018, ECDOH received a report of a three-year-old-child residing at the house with an EBLL of 14 µg/dL.

54.    ECDOH inspected the house on August 28, 2018, tested for and confirmed the presence of lead on surfaces in multiple locations, and created a LeadSAFE Erie County EBLL Investigation Report (the "August 2018 Report").

55.    On August 29, 2018, ECDOH sent a notice and demand letter to Homestead noting conditions conducive to lead poisoning and identifying three lead paint hazard violations at the property. ECDOH enclosed with that letter the August 2018 Report. The notice and demand letter reminded Williamsville Properties of its obligation under federal law to "disclose all available records and reports concerning lead-based paint and/or lead-based paint hazards, including the test results contained in this notice, to purchasers and tenants at the time of sale or lease or upon lease renewal".  It further explained that "[t]his disclosure must occur even if hazard reduction or abatement has been completed."

56.    On September 18, 2018, HEIL submitted a Lead Remediation Work Plan to ECDOH.

57.     On October 12, 2018, after interim controls purportedly were implemented, ECDOH inspected the property and observed that the violations had been "temporarily controlled, by the use of Interim Controls." By letter of October 23, 2018, ECDOH reminded Williamsville Properties of its "responsibility as owner of the property to regularly inspect the painted surfaces of the property for deterioration/damage, and to maintain these surfaces in good repair."

58.     On January 8, 2020, HEIL emailed DALFIN that an ECDOH inspector had been assigned to conduct an inspection at 145 Ashley.  Again, on July 6, 2020 there was another email correspondence regarding reinspection of the property.  As stated above in Paragraphs 23-26, DALFIN, through VIN7, sold this property in August of 2020 and failed to disclose his knowledge of lead-based paint hazards.

### iii.     53 Shepard Street

59.     According to ECDOH records, 53 Shepard, is a two-family house that was built in or about 1900 and was owned by Williamsville Properties beginning in 2013 through sometime in 2020.

60.     Between December 2014 and August 2019, ECDOH received reports of two children with higher than normal blood lead levels, including one with an extremely high EBLL.  Between January 2015 and August 2019, DOH found at least 41 lead paint hazard violations at the property.  Notices of violation were issued on at least three separate occasions: January 7, 2015, April 4, 2018, and August 6, 2019.

61.     On or about December 29, 2014, ECDOH received a report that a two-year-old resident of 53 Shepard (who resided with her pregnant mother) had a blood lead level of 8.3 µg/dL. On or about January 7, 2015, ECDOH inspected the house and found conditions conducive to lead poisoning, including chipping and peeling paint, and issued a notice of violation to the management company, Peck Properties.

62.     On behalf of Peck Properties, HEIL submitted to ECDOH a Lead Remediation Work Plan dated January 27, 2015.

63.     On February 5, 2015, HEIL, acting as agent for DALFIN, and on behalf of Williamsville Properties and Peck Properties, provided a lead disclosure statement to a new tenant, through Belmont Housing, which falsely stated that the "Lessor (Landlord) has no knowledge of lead-based paint and/or lead-based paint hazards in the housing" and that "Lessor (Landlord) has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing."

64.     ECDOH reinspected the house in April 2015 and June 2015 and determined on both of those inspections that the lead paint hazard conditions had not been remediated. Later, in July 2015, ECDOH inspected again and determined that lead hazards on the property were "temporarily controlled, by the use of Interim Controls," as indicated in a July 2, 2015 letter.

65.     On or about April 3, 2018, ECDOH inspected the house again and found conditions conducive to lead poisoning from deteriorated paint. ECDOH sent Williamsville

19

Properties a letter dated April 4, 2018, stating that an inspection of the premises determined that "conditions conducive to lead poisoning are present on your property."

66.     On April 18, 2018, HEIL submitted a Lead Remediation Work Plan to ECDOH.

67.     ECDOH inspected the house in August 2018 and determined that the previous violations had been corrected.  In an August 8, 2018 letter to Williamsville Properties, ECDOH noted: "Please be advised that if paint stabilization or other temporary methods were used, these methods are termed 'interim controls'."  ECDOH also stated: "Interim controls to painted surfaces require ongoing monitoring and appropriate maintenance.  It is your responsibility as owner of this property to regularly inspect painted surfaces for deterioration or damage and to maintain these surfaces in good repair."

68.     On or about August 2, 2019, ECDOH received a report of a child with an extremely high EBLL of 65 µg/dL at the property.

69.     ECDOH inspected the premises on August 2, 2019, tested for and confirmed the presence of lead on surfaces in multiple locations, and created a LeadSAFE Erie County EBLL Investigation Report (the "August 2019 Report").

70.     On August 6, 2019, ECDOH sent a notice and demand letter to Williamsville Properties noting conditions conducive to lead poisoning and identifying 23 interior and exterior lead paint hazard violations at the property.  ECDOH enclosed with that letter the

August 2019 Report. The notice and demand letter reminded Williamsville Properties of its obligation under federal law to "disclose all available records and reports concerning lead-based paint and/or lead-based paint hazards, including the test results contained in this notice, to purchasers and tenants at the time of sale or lease or upon lease renewal" (emphasis added). It further explained that, "[t]his disclosure must occur even if hazard reduction or abatement has been completed."

71.     On August 20, 2019, the property management company submitted a Lead Remediation Work Plan on behalf of Williamsville Properties to ECDOH.

72.     ECDOH reinspected the house on or about August 29, 2019, and informed Williamsville Properties that lead conditions were "temporarily controlled, by the use of Interim Controls." By letter dated August 30, 2019, ECDOH reminded Williamsville Properties of its "responsibility as owner of the property to regularly inspect the painted surfaces of the property for deterioration/damage, and to maintain these surfaces in good repair."

**E.      Use of Email to Fraudulently Transfer and Sell Properties**

73.     Prior to the NYSAG filing the Complaint in September of 2020, DALFIN and HEIL were aware of the State's ongoing investigation. In December of 2019, DALFIN received information that the NYSAG was issuing subpoenas regarding him and his companies.

74.    On January 11, 2020, HEIL emailed DALFIN with the subject line "properties

plan #1" which stated the following:

*REVENUE INCREASE*

*1. raising rent - we can do for March 1st - we need to send letter to all agencies and get this set up and let tenants know 3/1/20 we are raising rents I have targeted this and we need to be smart - we might not get what were asking but were gonna start- We might loose some tenants - and will be turnovers*

*2. If were gonna loose we need to turnover the units and get them in A+ shape- I have instructed Lisa to move ahead and rent to RAC- this will be challenging and we will need to remove woodwork and sils and old windows , etc each unit we need to get smart to avoid the lead bullshit - and pass - pass and pass*

*3. we are doing 43 deshler and 280 locust as RAC tenants and so we can get higher amounts , but we gotta have it set up and ready ....*

*4. Finish off 45 shepard - we need this building up and moving - its a mess and like mentioned above its a lead nightmare --- so we need to get this set up and like 15 , have a budget and plan -- its 1600 a month more when running ahead forward*

*............*

*6. Sell the dogs - we have some perennial losers -*
*19 krupp*
*190 emslie*
*23 liddel*
*57 townsend*
*71 moeller*
*76 chester*
*94 warren*
*342 herman*
*1204 bway*

*these are a mess and really just not worth the work or bullshit - I know these and so do you -- major headaches and  for example we had 76 chester low rents and never an issue we collected - and really zero headaches -- we boot them and raise rents and now its a shit show -- what did we gain ?*
*19 krupp - its brian eagans favorite house to site , as 94 warren is too*

Note: Brian Eagan is an ECDOH inspector.

75.    In 2020, DALFIN utilized email to facilitate the transfer and/or sales of the

Dalfin Properties.  DALFIN emailed numerous documents to Trinity Title and Abstract

Corp. (Trinity Title) detailing his ownership of the various entities, either in principal or as

agent, and hired Trinity Title to prepare deeds that would transfer properties from Williamsville Properties and Homestead to VIN7.

76.    Evidence obtained during the investigation shows that during 2020, as DALFIN was transferring and selling the Dalfin Properties, DALFIN emailed the signed contracts and lead riders to Trinity Title on behalf of VIN7.  For example, on July 1, 2020, DALFIN using the email address "dalfinny@gmail.com" emailed Trinity Title, which included one attachment which was the signed contract for 94 Warren.  On July 6, 2020, DALFIN using the email address "dalfinny@gmail.com" emailed Trinity Title, which included three attachments which were signed contracts for 145 Ashley, 53 Shepard and 19 Krupp.

77.    On July 6, 2020, DALFIN in preparing to finalize the sale of 53 Shepard and 145 Ashley, emailed the signed contracts along with the false Lead Riders.  Later the same day, HEIL emailed an inspector from ECDOH and blind carbon copied DALFIN.  The email listed six properties that were ready for reinspection (meaning there were outstanding violations); 145 Ashley was one of the properties that needed to be reinspected.

78.    Further evidence obtained during the investigation shows that HEIL assisted DALFIN in selling the Dalfin Properties, and they used email to communicate regarding the sales.

79.    DALFIN and HEIL were well aware of potential lead-based paint hazards in the Dalfin Properties but continued to sell them with false lead disclosures.

**F.      Attempt to Transfer Properties before TRO from VIN7 to Simms One, LLC**

80.      On October 29, 2020, New York State moved by Order to Show Cause for an *ex parte* order temporarily restraining DALFIN and VIN7 from selling or transferring any properties in New York State, including any and all of their real estate holdings in Buffalo. The State concurrently moved for a preliminary injunction ordering VIN7 to set aside $200,000 for payment of costs related to any lead inspections, remediation, restitution, fines, and penalties that the court may assess in the Dalfin Action.

81.      Shortly after discovering that the State had filed papers seeking a temporary restraining order and preliminary injunction against him and VIN7, DALFIN implemented a scheme to illegally transfer the remaining properties titled in the name of VIN7.

82.      On October 30, 2020, at 4:25 a.m., DALFIN emailed Trinity Title a list of 12 properties with the subject "list to sell/transfer at 120k – 12 houses." The email attachments included a copy of a driver's license for Yitzchok Blasenstein and an operating agreement for Simms One, LLC (Simms One).

83.      On October 30, 2020, at approximately 11:16 a.m., counsel for DALFIN and VIN7 emailed the Court and plaintiffs' counsel objecting to the *ex parte* nature of the State's order to show cause, objecting to the relief sought, and requesting an immediate hearing.

84.    On October 30, 2020, at 1:00 p.m., Hon. Catherine Nugent Panepinto, J.S.C.
held a hearing on the State's request for a restraining order against DALFIN and VIN7 (the
"TRO Hearing").

85.    On October 30, 2020, at approximately 12:43 p.m., just prior to the TRO
Hearing, agents of VIN7 filed a deed with the Erie County Clerk's Office transferring title of
twelve VIN7 properties in Buffalo to Simms One.  The deed shows that VIN7 transferred title
to twelve different properties to Simms One for a total reported purchase price of $240,000.

86.    The twelve properties in which title was transferred from VIN7 to Simms One
on October 30, 2020 are as follows:

- 193 Guilford St., Buffalo, New York;
- 106 Lombard St., Buffalo, New York;
- 43 Newton St., Buffalo, New York;
- 60 Rose St., Buffalo, New York;
- 501 Sherman St., Buffalo, New York;
- 115 Young St., Buffalo, New York;
- 87 Bryson St., Buffalo, New York;
- 95 Bryson St., Buffalo, New York;
- 139 Clark St., Buffalo, New York;
- 18 Concord St., Buffalo, New York;
- 20 Concord St., Buffalo, New York; and
- 39 Concord St., Buffalo, New York.

The twelve properties identified in this paragraph are referred to hereinafter, collectively, as
the "Twelve Properties."

87.    On October 30, 2020, at 2:31 p.m., Trinity Title emailed DALFIN
"Authorizations to sign and record documents" for VIN7 and Simms One.  At 2:42 p.m.,
DALFIN returned via email a signed Authorization for VIN7.  At 3:01 p.m., DALFIN

returned via email a signed Authorization for Simms One, which was purportedly signed by Yitzchok Blasenstein, but was a forged signature by DALFIN.

88.     The TRO Hearing ended at approximately 2:30 p.m.  At 3:53 p.m., the Court entered the temporary restraining order requested by the State (the "TRO"). The TRO provided, among other things, that:

> [P]ending the hearing and determination of this action, Angel Elliot Dalfin, Habitat Properties LLC, and VIN7, LLC and their principals, agents, officers, directors, members, employees and any other person under their direction and control, whether acting individually or in concert with others, or through any corporate or other entity or device, are hereby temporarily restrained and enjoined from, directly or indirectly:
>
> 1. Selling or otherwise transferring title to any person or entity any real property located in the State of New York; and
> 2. Transferring, selling or otherwise disposing of any assets owned, possessed, held, or controlled by VIN7, LLC, ....

89.     Although the documents filed on behalf of VIN7 with the Erie County Clerk list a purported sale price of $240,000 for the Twelve Properties, Simms One never paid any money to VIN7 or any third party for title to the Twelve Properties.

90.     On or about November 23, 2020, Blasenstein, the sole member of Simms One, repudiated the transaction transferring the Twelve Properties from VIN7 to Simms One. Blasenstein wrote to counsel for the State via email, copying DALFIN, that:

> Any transfer of properties to simms one llc [sic] was done without my knowledge, permission, understanding or any explanation of what was taking place and without providing me any documentation or request for any signatures on my behalf. i [sic] have been tricked, played, pressured and coerced into this.
> All documentation of sales of properties from simms one LLC [sic] was done so against my will, my understanding, knowledge, etc. I was pressured and manipulated into doing so....

*To the extent that I am able to void these agreements, I hereby declare this to be null & void by any legal avenue that may be available to achieve this.*

91.    Further evidence that DALFIN executed an illegal scheme to fraudulently transfer the twelve properties before the TRO is shown by the fact that on October 28, 2020, the day before the State sought the TRO, DALFIN emailed Trinity Title blank sales contracts listing VIN7 as the seller for four of the twelve properties: 501 Sherman, 60 Rose, 87 Bryson, and 95 Bryson. Each of these contracts was signed by DALFIN and contained a Lead Rider that indicated no known hazards. DALFIN was already planning to sell these properties but transferred them to Simms One before the TRO.

92.    Even after the TRO was entered on October 30, 2020, DALFIN continued to actively orchestrate and execute the sale of properties, including the Twelve Properties nominally held by Simms One. Between November 10, 2020 and December 18, 2020, DALFIN orchestrated and executed the sales of seven of the Twelve Properties from Simms One to third party buyers as follows:

- On or about November 10, 2020, he sold 87 Bryson Street, 20 Concord Street, and 106 Lombard Street;

- On or about December 2, 2020, he sold 60 Rose Street;

- On or about December 4, 2020, he sold 95 Bryson Street;

- On or about December 18, 2020, he sold 18 Concord Street and 139 Clark Street.

93.    The sales of the seven properties identified in the preceding paragraph were orchestrated and executed by DALFIN without the knowledge, consent, authorization, or

approval of Simms One. The sales of those seven properties were made illegally by DALFIN, and those sales contracts also included false Lead-Based Paint Disclosure riders, or no disclosure at all.

94.    On November 20, 2020, one of DALFIN's property investors forwarded him an email with a subpoena from the NYSAG. DALFIN responded as follows:

> *Hi William,*
>
> *I don't either know why they sent to my attorneys office in Baltimore. Also the subpoena is to my other son Menachem another issue I need to deal with.*
>
> *All I am trying to convey to you is that the AG is attacking Baltimore and they are very well aware of Baltimore.*
>
> *For this reason we need to be proactive as I was in Buffalo. It would have been very bad if I didn't sell the houses in Buffalo before the TRO.*
>
> *Thanks*
>
> *Elliot*

## IV.    CONCLUSION

95.    Based on the foregoing, I respectfully submit that I have probable cause to believe that **ANGEL ELLIOT DALFIN** and **PAUL RICHARD HEIL** have violated Title 18, United States Code, Section 371.

K. Angela Rivera, Special Agent
Environmental Protection Agency

Sworn and subscribed telephonically
this  28ᵗʰ day of May 2021.

HON. MICHAEL J. ROEMER
United States Magistrate Judge