UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - vs. -                                              Case No.: 21-mj-5130

PAUL R. HEIL,

       *Defendant.*

# DEFENDANT PAUL HEIL'S SENTENCING MEMORANDUM

**THE LAW OFFICE OF PARKER R. MACKAY**
*Counsel for Defendant Paul Heil*
 By: PARKER R. MacKAY, ESQ.
 3110 Delaware Avenue
 Kenmore, NY 14217
 Ph: (716) 803-8166
 Fx: (716) 408-1651
 Em: Parker@MacKayLawOffice.com

**PRELIMINARY STATEMENT**

Defendant Paul Heil pleaded guilty a single count information charging aiding and abetting the failure to provide lead paint hazard warning notice. *See* ECF No. 20. He comes before the Court now for sentencing on the single misdemeanor charge with the United States Attorney's Office agreeing not to oppose a recommendation to sentence at the low end of his relevant Guidelines range (0 to 6 months). *See* ECF No. 22 ¶ 15. Because such recommendation calls for no incarceration, and the facts and circumstances leading to the instant offense are such that further supervision is unnecessary to ensure Mr. Heil leads a law-abiding, productive life, we submit that a non-incarcerative, non-supervisory sentence is one that is, in the words of the federal sentencing statute, "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

**ARGUMENT**

**I.  STANDARDS**

In every sentencing, the court "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 47 (2007). The purpose of such assessment is to ensure that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011). To that end, a sentencing court must, after *United States v. Booker*, 543 U.S. 220 (2005), consider the statutory factors set forth in 18 U.S.C. § 3553(a) in fashioning an appropriate sentence – whether ultimately choosing to adhere to the Sentencing Guidelines or not. *See United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010) ("Under § 3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. § 3553(a)(2)."). Thus, "if the Guidelines represent the *initial* step in sentencing, they are

no longer the *stopping* point." *United States v. Genao*, 869 F.3d 136, 147 (2d Cir. 2017) (emphasis in original).

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 562 U.S. at 487 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). A court's sentencing decision should be informed and guided by mercy and compassion. *See United States v. Blarek*, 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998). While these principles are not specifically delineated as sentencing rationales, they are evidenced by the federal sentencing statute's mandate that a court impose the lowest possible penalty to accomplish the goals of sentencing. *Id.*; 18 U.S.C. § 3553(a). "The notion that undue harshness should be avoided by those sitting in judgment has long been a part of the human fabric and spirit. Lenity is often the desirable route." *Id.*

II.   THE 18 U.S.C. § 3553(a) FACTORS

  A.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

Paul Heil was the property manager for Angel "Elliot" Dalfin's large-scale property holdings in Buffalo, New York for over a decade. Paul and Elliot met years before when Paul owned his own rental properties; he helped Elliot enter the rental property business in Buffalo by identifying properties for purchase and then managing them as Elliot reaped the benefits from his New York City residence.

Elliot's property empire (hereinafter "the Dalfin properties") grew over the years, and managing the ever-increasing scale of properties became overwhelming as Elliot acquired more and more—all while resisting spending any funds on repair or upkeep of the properties. This

placed Paul in the difficult position of having to ensure repairs were completed, fees paid, and municipal obligations satisfied on demanding timetables with the limited funds he was provided (often only after the fact as reimbursement from spending his own money).

One of the many obligations foisted upon Paul was compliance with lead paint regulations. As Paul knew, and as the regulatory framework reflects, much of the City of Buffalo's housing stock is old, wood-structured, and contains lead paint hazards from work in years past. Paul had therefore dealt with City of Buffalo code inspectors over the years and was familiar with the lead paint remediation process: when concerns were raised by inspectors, he contacted licensed, approved remediation contractors who would remediate and re-test premises to inspectors' satisfaction. This is not a case where Paul is alleged to have fraudulently performed work to remediate a contaminated residence or covered up a fraudulent remediation.

Rather, what this case concerns is the provision of lead paint hazard warning notices to tenants during the rental process. Paul was responsible for placing and screening tenants in the Dalfin properties. The vast majority of the Dalfin properties were occupied by Section 8 tenants whose rental payments were coordinated by one of several entities: the Buffalo Municipal Housing Authority, Belmont Housing Resources of Western New York, or the Rental Assistance Corporation of Buffalo. As Paul understood it for many years, each of those entities used their own in-house forms to facilitate the rental process, and each of those forms separately informed tenants of lead paint hazards—such that there was no need for him to separately advise the tenants. Paul also understood that during the Section 8 move-in process, rental units were tested for lead paint hazards—and he would be informed if any unit did not pass inspection. Therefore, as he initially understood it, if a Section 8 inspection did not raise concerns, there were no lead

paint hazard concerns to pass along to the tenants. To that end, Paul did not follow up in providing the tenants with separate lead paint hazard warning notices as required by federal law.

Paul possesses an amazing recall of his duties: he remembers over the years exactly what work was done on a property, what any concerns were, who the tenants were, and any other notable issues about a property. Therefore, in the long history of dealing with specific properties, he would have been expected to remember whether there had been prior lead paint remediations done at a specific property. The federal law requires a landlord to disclose to a potential tenant any known lead paint hazards, or certify that they have no knowledge of such hazards. This he did not do. As Paul explains it, he was "pulled in a lot of directions" because he was never given adequate resources by Elliot to maintain the properties. It became a "cat and mouse game" in his mind trying to appease all the different oversight inspections with the limited resources he had, the constant push to fill the properties with tenants, and the need to ensure things were up to code. And that meant that skipping one step of the process when able.

Paul was served with a subpoena by the New York State Attorney General in mid-2018, which served as the first notification that all was not right with the Dalfin properties. He immediately retained undersigned counsel and thereafter cooperated with that agency's investigation by sitting for multiple depositions and producing thousands of documents. He assisted in identifying other landlords in the Buffalo area who were engaged in similar practices as Elliot Dalfin. He cooperated with the United States Attorney's criminal investigation into Elliot Dalfin, and he pleaded guilty without benefit of a cooperation agreement.

In contrast, Elliot Dalfin evaded service of civil subpoenas for several years, requiring the Attorney General to commence a separate civil contempt proceeding prior to bringing its full-blown enforcement action. To date he has answered no subpoenas, produced no documents, and

-4-

given no testimony. When he received notice that the Attorney General was attempting to obtain a temporary restraining order on his properties, he quickly sold them off in an underhanded manner.[1] He retained counsel to enter the Attorney General's civil suit, only to see counsel withdraw and for a default judgment to be granted against him. He is currently evading a federal arrest warrant in this case.

B.   HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Paul Heil is ultimately a good man who was stretched too thin by his boss. He was never fully given the resources to do his job by a greedy boss who reaped profits from afar—and he admittedly cut corners to make things work as best he could. But, on the ground, as Paul tells it, "he liked the action" of managing a large portfolio of properties: there were always things to do, always people coming to him, and, over the years, he came to know many tenants in the neighborhood, inspectors, and contractors. He established working relationships with realtors, housing officials, other landlords, contractors, and supply outlets. For all intents and purposes, he functionally ran the day-to-day operations of more than 100 properties. "It made [him] feel like more than a school teacher."

But Paul also has a rich life involved in the Buffalo Public Schools, where he has taught since 1997. Managing the Dalfin properties was an obligation above and beyond his significant commitment to teaching, where he not only teaches social studies full time during the day, but is

---

[1] Although there is reference in the PSR to these transfers, PSR ¶¶ 91-112, it is undisputed amongst all parties (the Attorney General, the United States Attorney) that Paul Heil played no part in the alleged fraudulent transfer(s) in October 2020. All transfers and sales of properties were handled exclusively by Elliot Dalfin. Mr. Heil's involvement was limited to expressing some thoughts on what to do about certain properties in early 2020 and identifying local buyers for the properties when asked during 2019 to 2020. *See* PSR ¶ 92, 96.

also heavily involved in summer school, after school activities, and coaching of girls' softball. Paul currently teaches at Public School 37 (Futures Academy) in the Fruit Belt area of the City, and Paul is often called upon to attend to children after hours when their parents are absent.

This arrest represents Paul's first brush with the law—and very likely his last, as the circumstances surrounding this offense are unique to the relationship he had as Elliot Dalfin's property manager. He is not a grifter making his way from one fraudulent scheme to another; his work for Elliot applied the only other set of skills he possessed other than teaching insofar as he and his father had owned rental properties for years before selling them all off. Paul otherwise has a stable income and family support, and his focus is long gone from property management.

### C. NEED FOR SENTENCE IMPOSED TO SATISFY SENTENCING GOALS

A sentence should afford adequate deterrence to criminal conduct, protect the public from further crimes, and reflect the seriousness of the offense. 18 U.S.C. § 3553(a)(2)(A), (B) & (C). Paul Heil has served the equivalent of a year on probation in the guise of pretrial supervision while this case has progressed. This has come with significant restrictions to his freedom, as he has been required to report to the probation department, had his travel restricted, and must comply with all necessary conditions of pretrial release. He has dutifully complied without issue.

Further supervision of Mr. Heil is respectfully not warranted, and, as a possible sentence, the Court should consider imposing a sentence of probation to terminate *instanter*. The circumstances that led to the instant offense (and the underlying conduct) wholly arose from Paul's connection to Elliot—a connection that has not existed for several years now, as Paul feels betrayed by Elliot. Paul no longer manages properties, and he has no desire to re-engage in that industry in the Buffalo, New York area as either a landlord himself, or as a property manager for

another landlord.  He instead looks forward to the day—in the not-too-distant future—when he can retire from his longtime Buffalo Public Schools teaching position and retire to Florida to be closer to his son.

The weight of this case has hung over Paul in some form or another for years, from the day he received a subpoena from the Attorney General in 2018.  His name was published in news articles describing both the criminal charges and the Attorney General's civil suit.  The stress led to a heart attack last year.  The civil suit is still ongoing.  And Paul now has a misdemeanor conviction on his record.  These are significant consequences attendant to his plea of guilty to a misdemeanor.

## **CONCLUSION**

For all the above-stated reasons, the Court should impose a non-supervisory, non-incarcerative sentence as one that is "sufficient, but not greater than necessary."

Dated: June 6, 2022
      Kenmore, New York                Respectfully submitted,

                                            s/Parker R. MacKay

                                  **THE LAW OFFICE OF PARKER R. MACKAY**
                                  *Counsel for Defendant Paul Heil*
                                   By: PARKER R. MacKAY, ESQ.
                                   3110 Delaware Avenue
                                   Kenmore, NY 14217
                                   Ph: (716) 803-8166
                                   Fx: (716) 408-1651
                                   Em: Parker@MacKayLawOffice.com